**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

AYANNA SMITH,                )
                              )
     Plaintiff,           )
                              )
     v.                    )     Civil Case No.:
                              )
SECONDMUSE FOUNDATION     )
and                       )
SECONDMUSE GROUP, LLC,     )     **COMPLAINT**
                              )
     Defendants.      )     **Jury Trial Demanded**
                              )
SERVE:                   )
SECONDMUSE FOUNDATION     )
c/o Northwest Registered Agent Service, Inc.     )
8 The Green, Suite B     )
Dover, Delaware 19901     )
                              )
SERVE:                   )
SECONDMUSE GROUP, LLC     )
c/o Bruce F. Malott, Registered Agent     )
901 3rd Street, NW, Suite A     )
Albuquerque, New Mexico 87102     )
_____)

Plaintiff Ayanna Smith ("Plaintiff") hereby alleges as follows:

<u>**INTRODUCTION**</u>

1.   Defendants SecondMuse Foundation ("the Foundation") and SecondMuse Group, LLC ("the Company") (and collectively, "SecondMuse" or "Defendants"), employed Plaintiff, an African American female in the position of Managing Director, Gender Equality in Technology (GET), DC from April 2021 until March 29, 2023, when Plaintiff was suddenly terminated. Upon being told that her employment was being terminated, Plaintiff asked the obvious question – "why"?  In response, in-house counsel for SecondMuse (both for the Foundation and the Company) explained that they were not required to provide Ms. Smith with a reason for this decision.

2.   The reasons are obvious, as explained below.

3.   In December 2022, Plaintiff advised Defendants that she had been diagnosed with cancer and that she would have to undergo treatment for it.

4.   On or about February 8, 2023, Plaintiff complained to her supervisor, Leslie Smith, National Director of GET Cities, about how she was being treated. Plaintiff explained that she felt she was being targeted by Defendants and that they were treating her differently than her non-African American colleagues. Plaintiff voiced these complaints because since she had informed Defendants about her cancer diagnosis and treatment, particularly in late January and early February 2023, she had been subjected to strict – and selective – enforcement of Defendants' purported policies and practices. In sum, Plaintiff was being singled out for the alleged "enforcement" of Defendants' purported policies and practices because of her race; because she had taken a leadership in raising concerns about race and unequal treatment and unequal opportunity which had been voiced to her by other employees who were not Caucasian; and because she had disclosed her disability and the need for ongoing medical treatment.

5.   On February 20, 2023, Plaintiff again complained about this issue, this time to Defendants' Human Resources department. More specifically, Plaintiff complained to Defendants' Director of Human Resources that she believed she was being targeted based upon her race and gender, as an African American Female, and further, because she had a disability which required ongoing treatment.

6.   Plaintiff's work performance had always been outstanding. Plaintiff had never been disciplined. She had never been placed on any sort of performance improvement plan or given any type of corrective action. In September 2022, Plaintiff received a salary increase along with her annual cost of living increase as a result of her annual performance review.

7.   After Plaintiff voiced her complaints about being targeted, as referenced above, Plaintiff took approximately two weeks of leave to address issues relating to her health and well-being, due to her ongoing treatment for cancer.

8.   Plaintiff returned to work on March 20, 2023. On March 29, 2023, Defendants suddenly and inexplicably terminated Plaintiff's employment and when she asked why this was occurring, she was told that she was an at-will employee and that they were not required to give Plaintiff a reason.

9.   Defendants' conduct was wrongful and illegal. They discriminated against Plaintiff because of her race, gender, and disability, and because she had complained about being targeted and treated differently because of her race, gender, and disability.

10. For that, Plaintiff seeks to hold Defendants accountable through this lawsuit and obtain justice for the wrongs and harm that she has been forced to endure.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343 as this action asserts a claim that arises under the Constitution, laws or treaties of the United States, specifically 42 U.S.C. § 1981; Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"); and the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.* ("ADA").

12. Venue is proper pursuant to 28 U.S.C. § 1391 because Defendants SecondMuse Foundation and SecondMuse Group, LLC, conducted business in Washington, D.C., Plaintiff worked remotely for Defendants from her home in Washington, D.C., and a substantial part of the events or omissions giving rise to this action, including the unlawful discrimination and retaliation alleged herein, as well as the damage caused by such, occurred in this district.

13. Plaintiff has exhausted her administrative remedies and is filing this action after requesting to withdraw her charge. She is filing this action within the time provided to her after she received her Notice of Right to Sue letter from the Equal Employment Opportunity Commission.

## PARTIES

14. Plaintiff Ayanna Smith is a citizen of Washington, D.C., and is a former employee of Defendants. At all relevant times, Plaintiff worked remotely for Defendants from her home in Washington, D.C., and met the definition of an "employee" as that term is defined by the applicable statutes.

15. Defendants employ persons located in and conduct ongoing business within Washington, D.C.

16. Defendant SecondMuse runs most aspects of day-to-day operations of SecondMuse Foundation, including but not limited to Human Resources and Legal Services.

17. In relation to her hiring, Plaintiff was required to acknowledge receipt of the "SecondMuse" "Global Employee Handbook" – "For All People At SecondMuse."

18. This Global Employee Handbook provides a lengthy listing of policies applicable to employees of SecondMuse. The Handbook provides in part that its contents are "applicable across employees in all locations." It further states: "Additionally, as we are a global company, the appendix contains specific country-based policies."

19. The Handbook repeatedly refers to "the Company" and appears to make no mention of the "Foundation." It also provides that "Questions or concerns about company and/or personnel matters may also be communicated to the People Operations team." Upon information and belief, that reference is to the Human Resources team that provided common "HR" services to employees of SecondMuse (whether they worked for the Company or the Foundation).

20. Plaintiff signed an acknowledgment of receipt for the Global Employee Handbook, which stated in part: "I acknowledge receipt of the forgoing Global Employee Handbook and agree to all applicable terms therein."

21. In addition to utilizing the same employment policies (i.e., for employees of the Company and the Foundation), SecondMuse also uses a commonality of leadership for such. By way of example, in March 2023 – when Plaintiff's employment was terminated – Carrie Freeman states on her LinkedIn profile that she was "Co-CEO" of SecondMuse, and describes her own work and the work of SecondMuse as follows:

"I am responsible for the overall performance and direction of the company with offices on three continents and programming across 150 countries.

Fundamentally I believe in the infinite capacity for humans to learn and grow, and the potential for inclusive markets and businesses to massively scale positive change. Under my leadership, SecondMuse has run programs that define inspiring visions, build lasting businesses, and unite people across the globe.

I manage the company leadership team, overseeing the day-to-day program delivery and company-wide operations. By partnering with our CFO to lend financial guidance and encouraging them to endorse my concept of inclusivity for change and growth, we have experienced, on average, a 40% year-over-year growth.

Over the last decade, **our team** has designed and **implemented programs** on 7 continents with 600+ organizations. Our programs define inspiring visions, build lasting businesses, and unite people across the globe. Our work spans sectors yet seeks to benefit people and protect the planet.

**Our programs range from** The Incubation Network, where we're focused on ending plastic pollution, **to GET Cities**, **where we aim to accelerate female representation in the tech industry**, to NASA Space Apps Challenge, where we foster solutions to address real-world problems on Earth and in space. We recognize and respect that transforming systems takes time.

These programs have allowed us to partner with cities, governments, and organizations that are also planning a future with limitless possibilities. Some of those organizations include NASA, The World Bank, Nike, Pivotal Ventures, **a Melinda Gates Company**, USAID, The World Health Organization, The Rockefeller Foundation, and the W.K. Kellogg Foundation. Managing and advising these key partners and clients and program leaders is my direct responsibility."

5

https://www.linkedin.com/in/carrie-freeman/ (**Emphasis** added).

22. During the same time frame, Plaintiff worked for Defendants as the "**DC Managing Director, GET Cities**." (**Emphasis** added).

23. During the same time frame, Todd Khozein was Co-CEO of SecondMuse with Carrie Freeman. Chad Badiyan is one of four owners of the Company, and at the time of Plaintiff's termination served as President of the Foundation. Leslie Smith – who worked as National Director, GET Cities and was Plaintiff's immediate manager when Plaintiff worked for Second Muse – also reported directly to Mr. Badiyan and the Board of the Foundation. She also reported to Mr. Khozein and Ms, Freeman in some capacity.

22. During the operative time, the Foundation and the Company jointly shared their leadership; their management and support services; and their employment policies and practices. Under applicable law, Defendants are joint-employers of Plaintiff.

## FACTS

23. Plaintiff began working for SecondMuse Foundation in April 2021. As noted above, she served as the Managing Director of the Washington, D.C., component of its Gender Equality in Technology (GET) program.

24. In this role, Ms. Smith's key duties included the management of the local team, contributions to and execution of strategy, overseeing the Washington, D.C.-based program, development of best practices to achieve the goals of increased representation of women in technology.

25. Plaintiff's initial annual salary was $125,000; her annual salary at the time of her termination increased to $159,500.

26. In December 2022, Plaintiff advised Defendants that she had been diagnosed with cancer and that she would have to undergo treatment for it. She expressed her intent to continue working as much as possible, but that she may need to take sick days at times in relation to her treatment.

27. As noted above, on or about February 8, 2023, Plaintiff complained to her supervisor, Leslie Smith, National Director of GET Cities (who reported directly to the Co-CEOS for SecondMuse), about how she was being treated. Plaintiff explained that she felt she was being targeted by Defendants and that they were treating her differently than her non-African American colleagues. Plaintiff voiced these complaints because since she had informed Defendants about her cancer diagnosis and treatment, particularly in late January and early February 2023, she had been subjected to strict – and selective – enforcement of Defendants' purported policies and practices. Instances of this included intense questioning by Stephanie Gliege, General Counsel for Second Muse, about a purported conflict of interest in relation to Plaintiff's efforts to secure the services of a local non-profit group (Porchfest DC) for help in organizing and promoting an upcoming event (Hack for Impact Dinner Series) for GET DC. In the course of requesting assistance for this small nonprofit group, whose support was critical for GET DC to secure, Ms. Gliege began raising questions about a purported conflict of interest for Plaintiff involving Porchfest DC, even though it was Plaintiff's understanding that Ms. Gliege already knew that Plaintiff also served as a volunteer on the board of directors for such group.

28. Similarly, near the same time, Heidi Hamlow, Global Finance Director for SecondMuse, began questioning Plaintiff about the timing of her submission of travel plans to attend a team retreat the following week in Miami. In response, Ms. Hamlow required Plaintiff to explain why Plaintiff delayed making travel arrangements and asserted that SecondMuse's "policy" was that

travel arrangements be made well in advance. In relation to that, Ms. Hamlow cited to Plaintiff "our travel guidelines" on the company's intranet. Upon information and belief, those guidelines applied not only to the Foundation, but also to the Company.

29. Plaintiff was being questioned and criticized by Ms. Gliege and Ms. Hamlow about these issues, even though Plaintiff had been asked – by personnel who at least purportedly worked for the Company – to secure office space for use by such personnel for matters which apparently related to the business of the Company and not of the Foundation.

30. Based upon that, Plaintiff secured such office space on her work charge card. Further, upon information and belief, Ms. Gliege and Ms. Hamlow were not placing such focus and questioning similar conduct of other employees of SecondMuse who were not African American females and who were not disabled, including the daughter of Plaintiff's direct supervisor, Leslie Smith, who was hired to facilitate a GET Cities retreat.

31. In sum, Plaintiff was being singled out for the alleged "enforcement" of Defendants' purported policies and practices. The question that Plaintiff was wrestling with was why this was occurring.

32. Plaintiff realized, as this was ongoing, that one motivation for this increased, negative scrutiny was her having taken a leadership role in raising concerns about race and unequal treatment and unequal opportunity which had been voiced to her by other employees who were not Caucasian. At the request of other African American Female employees, Plaintiff raised these concerns, which prompted a meeting with an outside mediator to occur in late August 2022 to discuss these concerns. Plaintiff played a pivotal role in leading the discussion in that meeting, and Mr. Khozein, Mr. Badiyan, and Ms. Freeman were also involved. Upon information and

belief, Ms. Gliege was also aware of what occurred in this meeting and the significant role that Plaintiff played in it.

33. Plaintiff had not sought to take a leadership role on that issue. However, after several different African American Female employees had expressed their concerns to her about issues concerning unequal treatment and opportunity, she felt that she had no choice but to do so.

34. Plaintiff had experienced – and was continuing to witness such instances herself. In particular, she had witnessed the more favorable treatment of a Caucasian Female employee, Carley Mostar, who had significant performance problems over an extended period of time. Despite this, to Plaintiff's knowledge, Ms. Mostar was never placed on a performance improvement plan and was not disciplined or given any other form of corrective action.

35.  This was an important consideration for Plaintiff as she was experiencing the increased scrutiny and criticisms referenced above from other Caucasian employees at SecondMuse (i.e., Ms. Gliege and Ms. Hamlow). Through such, it became clear to her that she was being targeted for illegal reasons: for her race and gender, as an African American Female, and because of her disability.

36. On February 20, 2023, Plaintiff again complained about this issue, this time to Defendants' Human Resources Director, Jade Nikolaou.  Plaintiff complained Jade Nikolaou that she believed she was being targeted based upon her race and gender, as an African American Female, and further, because she had a disability which required ongoing treatment. Ms. Nikolaou sent an email to Plaintiff to document Plaintiff's complaint to her. In that email, she copied other SecondMuse personnel, to include Plaintiff's direct supervisor, Leslie Smith.

37. Importantly, Plaintiff's work performance has always been outstanding. Plaintiff had never been disciplined. She had never been placed on any sort of performance improvement plan or given any type of corrective action.

38. After Plaintiff voiced her complaints about being targeted, as referenced above, on or about March 3, 2023, she took approximately two weeks of leave to address issues relating to her health and well-being, due to her ongoing treatment for cancer. The increased stress that she was experiencing because of the wrongful targeting that she was enduring, as well as her ongoing treatment for cancer, caused her to take this leave.

39.  Upon information and belief, SecondMuse personnel did not conduct an investigation into Plaintiff's allegations, both to Ms. Smith in early February 2023, and later to Ms. Nikolaou.

40. Plaintiff returned to work on March 20, 2023, and resumed her duties.

41. On March 29, 2023, Defendants suddenly terminated Plaintiff's employment and when she asked why this was occurring, she was told that she was an at-will employee and that they were not required to give Plaintiff a reason.

42. The following day, Plaintiff was contacted by a local news outlet to ask if she would tell her story of what had occurred. Plaintiff answered questions of the reporter, and a story about the situation was published. Importantly, in response to a question from the reporter, Plaintiff confirmed that the day after she was terminated, she had filed a charge of discrimination with the District of Columbia Office of Human Rights. This was referenced in the article that was published, which also further indicated that Plaintiff was pursuing legal action against SecondMuse.

43. Subsequent thereto, in a letter from Ms. Gliege to undersigned counsel for Plaintiff, Ms. Gliege stated in part:

10

"We are also aware that Ayanna has contacted a journalist . . . The threat of a lawsuit, the negative press, and the breach of her confidentiality obligations do not incentivize SecondMuse Foundation to grant Ayanna's request especially given that her claims of harassment and discrimination are unfounded."

44. Ms. Gliege's statements constituted a further threat and instance of retaliation against Plaintiff. The filing of a charge of discrimination by Plaintiff with the District of Columbia Office of Human Rights was protected activity under the law. Despite that, Ms. Gliege and SecondMuse clearly used that against Plaintiff.

45. Since the termination of her employment, Plaintiff has continued to receive treatment for cancer. This has been made much more difficult because she has also had to face an extended period of unemployment, lost wages and benefits, and significant, ongoing emotional distress and trauma.

## COUNT I
### Discrimination and Retaliation
**Violation of Title VII, Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq.**

46. Plaintiff re-alleges and incorporates by reference each and every allegation in paragraphs 1-45 above, as if fully set forth herein.

47. Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any individual with respect to [her] compensation, terms, conditions, or privileges of employment because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2(a)(1), and from retaliating against employees from engaging in activity protected by Title VII, *id.* § 2000e-3(a). To that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57-65-65 (1986).

48. As outlined above, Defendants were Plaintiff's employer for purposes of Title VII.

49. Plaintiff was subjected to increased scrutiny and criticisms for purported violations of SecondMuse's policies and practices and ultimately, her employment was suddenly terminated on March 29, 2023. Plaintiff believes that Caucasian employees of SecondMuse who are similarly situated with Plaintiff have been treated more favorably than she was treated. This includes but is not limited to the ongoing, favorable treatment afforded to Carley Mostar, who is Caucasian, who had ongoing, significant performance problems that, to Plaintiff's knowledge, never resulted in termination.  Plaintiff's employment was terminated because of her race and gender.

50. Plaintiff's termination was also the result of retaliation for her protected activity. It occurred just over 30 days from the date that she filed a complaint of discrimination and retaliation with Human Resources personnel with SecondMuse.

51. Plaintiff's work performance had always been outstanding. She had never been disciplined or received any corrective action, and she had never been placed on any type of performance improvement plan.

52. Defendants also terminated Plaintiff's employment because she engaged in protected activity, by complaining about discrimination because she was an African American female and because she had a disability.

53. Defendants' wrongful conduct was willful and malicious – it was carried out with malice towards Plaintiff, and it was designed to get rid of her and to shut her up, so to speak, so that she would not continue to raise issues about race and other forms of discrimination.

54. Because of Defendants' conduct, Plaintiff has suffered and is continuing to suffer lost wages; damage to her reputation; emotional distress and trauma; and other forms of compensatory damages because of Defendants' wrongful and illegal conduct.

55. As such, Plaintiff seeks to recover against Defendants, for Count I, the statutory maximum amount of $300,000 in compensatory and punitive damages, plus an award of back pay and front pay, as well as her attorneys' fees and costs.

## COUNT II
### Retaliation and Discrimination
### Violation of 42 U.S.C. § 1981 – Retaliation

56. Plaintiff re-alleges and incorporates by reference each and every allegation in paragraphs 1-45 above, as if fully set forth herein.

57. 42 U.S.C. § 1981 prohibits an employer from discriminating against any of its employees "because she has opposed any practice made an unlawful employment practice by this subchapter, or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 1981.

58. As outlined above, Defendants were Plaintiff's employer for purposes of § 1981.

59. Plaintiff was subjected to increased scrutiny and criticisms for purported violations of SecondMuse's policies and practices and ultimately, her employment was suddenly terminated on March 29, 2023. Plaintiff believes that Caucasian employees of SecondMuse who are similarly situated with Plaintiff have been treated more favorably than she was treated. This includes but is not limited to the ongoing, favorable treatment afforded to Carley Mostar, who is Caucasian, who had ongoing, significant performance problems that, to Plaintiff's knowledge, never resulted in discipline or other corrective action against her. Plaintiff's employment was terminated because of her race in violation of § 1981.

60. Plaintiff's termination was also the result of retaliation for her protected activity. It occurred just over 30 days from the date that she filed a complaint of discrimination and retaliation with Human Resources personnel with SecondMuse.

61. Plaintiff's work performance had always been outstanding. She had never been disciplined or received any corrective action, and she had never been placed on any type of performance improvement plan.

62. Defendants' wrongful conduct was willful and malicious – it was carried out with malice towards Plaintiff, and it was designed to get rid of her and to shut her up, so to speak, so that she would not continue to raise issues about race and other forms of discrimination.

63. Because of Defendants' conduct, Plaintiff has suffered and is continuing to suffer lost wages; damage to her reputation; emotional distress and trauma; and other forms of compensatory damages because of Defendants' wrongful and illegal conduct.

64. As such, Plaintiff seeks to recover against Defendants, for Count II, compensatory damages in excess of $500,000, as well as punitive damages in excess of $1,000,000, plus an award of back pay and front pay, as well as her attorneys' fees and costs.

<u>COUNT III</u>
**Retaliation and Discrimination**
**Violation of the Americans with Disabilities Act (ADA) of 1990, 42 U.S.C. § 12101, et seq.**

65. Plaintiff re-alleges and incorporates by reference each and every allegation in paragraphs 1-45 above, as if fully set forth herein.

66. 42 U.S.C. § 12112 prohibits an employer from "discriminating against a qualified individual on the basis of disability," and further prohibits an employer from "utilizing standards, criteria, or methods of administration…that have the effect of discrimination on the basis of disability." 42 U.S.C. § 12112.

67. As outlined above, Defendants were Plaintiff's employer for purposes of the ADA. *See* 42 U.S.C. § 12111(5).

68. Further, Plaintiff was a qualified individual pursuant to § 12111(8) of the ADA and suffered from a "disability" as outlined in § 12102. 42 U.S.C. §§ 12111(8); 12102.

14

69. 42 U.S.C. § 12203(a) prohibits an employer from discriminating against any of its employees "because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203.

70. Once Plaintiff informed Defendants about her cancer diagnosis and treatment, particularly in late January and early February 2023, Defendants strictly and selectively enforced its purported policies and practices on Plaintiff.

71. Plaintiff was singled out for the alleged enforcement of Defendant's purported policies and practices because of her disclosed disability and the need for ongoing medical treatment.

72. As explained above, Plaintiff's employment was suddenly terminated on March 29, 2023. When she asked why this was occurring, Plaintiff was not given a reason for it; she was told that they did not have to give a reason.

73. Plaintiff's termination occurred just over 30 days from the date that she filed a complaint of discrimination and retaliation with Human Resources personnel with SecondMuse. It also occurred within days of her returning from approximately two weeks' leave, which she took because of the increased stress that she was experiencing, in part due to her disability and the ongoing treatment that she was receiving for it.

74. Plaintiff's work performance had always been outstanding. She had never been disciplined or received any corrective action, and she had never been placed on any type of performance improvement plan.

75. Defendants terminated Plaintiff's employment because she had a disability and because she had just returned from taking leave to help her address such issues. Plaintiff believes that

15

Defendants have not terminated the employment of another employee who did not have a disability, under similar circumstances.

76. Defendants also terminated Plaintiff's employment because she engaged in protected activity, by complaining about discrimination because she was an African American female and because she had a disability.

77. Defendants' wrongful conduct was willful and malicious – it was carried out with malice towards Plaintiff, and it was designed to get rid of her and to shut her up, so to speak, so that she would not continue to raise issues about race and other forms of discrimination.

78. Because of Defendants' conduct, Plaintiff has suffered and is continuing to suffer lost wages; damage to her reputation; emotional distress and trauma; and other forms of compensatory damages because of Defendants' wrongful and illegal conduct.

79. As such, Plaintiff seeks to recover against Defendants, for Count III, the statutory maximum amount of $300,000 in compensatory and punitive damages, plus an award of back pay and front pay, as well as her attorneys' fees and costs.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff Ms. Ayanna Smith, respectfully prays that this Court enter judgment in her favor and against Defendants and grant her the following relief:

a.   Enter a declaratory judgment finding that the foregoing actions, conduct, and practices of Defendants complained of herein violate the laws of the United States;

b.   Grant Plaintiff a permanent injunction enjoining Defendants, its officers, agents, successors, employees, attorneys, assigns and other representatives, and all those acting in concert; or participation with them and at their direction, from engaging in any policy or practice shown to discriminate against Plaintiff in violation of Title VII on the basis of race, gender, and retaliation, and in violation of 42 U.S.C. § 1981 on the basis of race and retaliation;

16

c.   Grant Plaintiff an injunction and order requiring Defendants to take appropriate action to protect employees, prevent discrimination and provide avenues for prompt and immediate corrective action, with such measures to include, but not be limited to, the measures set forth above;

d.   Grant Plaintiff an award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages;

e.   Grant Plaintiff an award of damages against Defendants in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including but not limited to, compensation for emotional distress and/or mental anguish;

f.   Grant Plaintiff an award for punitive damages and any applicable penalties in an amount to be determined at trial;

g.   Award Plaintiff fees and costs incurred in this action, including but not limited to, expert witness fees, reasonable attorney's fees and costs;

h.   Order such other further relief as this Court deems just and equitable.

## **<u>JURY DEMAND</u>**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: May 28, 2024                    Respectfully Submitted,

                                       */s/ John B. Flood*

                                       _____
                                       John B. Flood (Bar No. 500069)
                                       FLOOD LAW LLC
                                       1 Research Court, Suite 450
                                       Rockville, MD 20850
                                       Phone: (240) 599-8024
                                       Fax: (240) 238-7065
                                       Email: john@fmlaw.org
                                       *Counsel for Plaintiff*